*971 TEXTO COMPLETO DE LA SENTENCIA
Ondeo de Puerto Rico, Inc. (Ondeo) y la Autoridad de Acueductos y Alcantarillados (Acueductos) nos presentaron recursos, por separado, apelando la sentencia del Tribunal de Primera Instancia, Sala Superior de San Juan (T.P.I.), emitida en la demanda sobre cobro de dinero por servicios profesionales presentada contra éstos por Prieto Batista Legal Services, Inc. (Prieto Batistal). 
En el recurso KLAN-2006-00861, Ondeo señala que incidió el tribunal al imponerle responsabilidad solidaria por lo adeudado a Prieto Batista, ya que al finalizar el contrato de servicios, entre Ondeo y Acueductos, el contrato con Prieto Batista había sido cedido a Acueductos y, además, Ondeo no retuvo ninguno de los fondos generados del cobro de las cuentas morosas gestionados por Prieto Batista, remitiendo éstos a Acueductos. Reclama, además, que incidió el tribunal al negarse a considerar la demanda contra coparte que presentó contra Acueductos. En el recurso KLAN-2006-00862, Acueductos señala que incidió el tribunal al imponerle responsabilidad solidaria por lo adeudado a Prieto Batista.
Procedemos a confirmar la sentencia apelada.
I
Entre el 1ro de julio de 2002 y el 15 de enero de 2004, Ondeo fungió como la firma contratada por Acueductos para que operara, manejara, mantuviera, reparara y, cuando fuera necesario y apropiado, reemplazara los activos del sistema de aguas y aguas usadas de Acueductos, bajo un contrato denominado “Service Contract”. Acueductos decidió terminar la relación con Ondeo, para cuyo propósito Acueductos y Ondeo suscribieron varios acuerdos, efectivos para el período posterior al 13 de enero de 2004, denominados “Resolution Agreement”, “Transition Services Agreement" y “Professional Services Agreement”.
Las funciones de Ondeo bajo el “Service Contract’ incluían cobrar por los servicios de Acueductos a los abonados de ésta. El 12 de septiembre de 2003, mientras estaba en pleno vigor y sin modificaciones el “Service Contract” entre Ondeo y Acueductos, Ondeo subcontrató con Prieto Batista las gestiones de cobro de ciertas cuentas morosas. Para ello, Ondeo y el bufete Prieto Batista, suscribieron el 12 de septiembre de 2003. el documento denominado “Contrato de Servicios Profesionales", bajo el cual dicho bufete de abogados se encargaría de los trámites legales de cobro requeridos para varias cuentas de clientes de Acueductos, cuyos pagos no se habían recibido dentro del plazo programado para ello (en adelante nos referiremos a éstos como clientes morosos). Los trámites de cobro conllevaron que el bufete Prieto Batista presentase y gestionara demandas a nombre de Acueductos contra los clientes morosos, obteniendo acuerdos transaccionales o sentencias y gestionando el cobro de éstas. Por sus servicios, Prieto Batista recibiría un predeterminado por ciento del dinero recibido por Acueductos.
*972 Según la cláusula DÉCIMO CUARTO del contrato entre Prieto Batista y Ondeo, cada parte tenía derecho a “rescindir” el contrato de servicios profesionales, mediante notificación escrita enviada un mínimo de sesenta (60) días previos a la fecha de efectividad de dicho acto. El 30 de marzo de 2004, el Sr. Norman Rosario, Director de Compras y Logística, envió una notificación escrita a Prieto Batista, indicando que activaba la referida cláusula del contrato. 
El 22 de octubre de 2004, Prieto Batista presentó una demanda sobre cobro de dinero contra Ondeo y Acueductos, en la cual reclamaba que Ondeo y Acueductos le debían la suma de $100,816.12, por sus servicios bajo el contrato de servicios profesionales. Dicha suma representa el doce por ciento (12%) de las cantidades de dinero recibidas por Acueductos, en cobro de ciertas cuentas morosas, respecto las cuales Prieto Batista había instado demandas de cobro de dinero, actuando como representante legal de Acueductos. Indicó que, a partir del 1ro de abril de 2004, Acueductos asumió control absoluto de las operaciones de la AAA, incluyendo el que de esa fecha en adelante Prieto Batista le envió directamente a Acueductos los pagos de los clientes morosos, en vez de remitirlos a Ondeo como había hecho previo a dicha fecha.
Ondeo contestó la demanda el 19 de enero de 2005 y Acueductos el 13 de mayo siguiente. Ambas partes demandadas se limitaron a negar el ser responsables por el pago de lo facturado por Prieto Batista. Ninguna de las dos parte codemandadas alegó que la suma que se le debía a Prieto Batista era responsabilidad de la otra parte codemandada, limitándose a alegar que no era responsabilidad suya. Tampoco adujeron que en caso que el tribunal le ordenase pagar lo reclamado por Prieto Batista, dicha parte tenía derecho a que la otra parte codemandada le reembolsara lo pagado.
Las partes sometieron el Informe de Conferencia entre Abogados el 19 de agosto de 2005. En éste, las partes demandadas, Ondeo y Acueductos, no presentaron enmiendas a sus alegaciones. En el resumen de su teoría del caso, Ondeo siguió de cerca sus alegaciones en la contestación a la demanda. El resumen por Acueductos de su teoría del caso elaboró un poco su contestación a la demanda, añadiendo que al finalizar el período de transición entre Ondeo y Acueductos, “la AAA decidió no aceptar ni asumir las responsabilidades del contrato aquí en controversia entre Ondeo y Prieto Batista Legal Services. Por ello, la AAA no está obligada a realizar ningún pago por las gestiones realizadas por dicha entidad para el cobro de cuentas morosas. ”
La vista en su fondo del caso quedó señalada para el 15 de diciembre de 2005.
No obstante, el 17 de noviembre de 2005, Ondeo presentó una moción denominada “Demanda Contra Coparte . Alegó que si este Honorable Tribunal fallara en su día a favor de la parte demandante esas sumas estarían sujetas a los requisitos de reembolso del ‘Resolution Agreement’ incluyendo el ‘Transition Services Agreement. Indico, que a partir del 1ro de abril de 2004, Ondeo dejó de recibir los pagos de los clientes cuyas cuentas morosas habían sido referidas a Prieto Batista para su cobro, ya que desde esa fecha en adelante los pagos recibidos se le enviaban a Acueductos directamente. Además, que después de esa fecha las facturas de Prieto Batista se le remitían directamente a Acueductos y que Acueductos tácitamente admitió su responsabilidad al pagar alguna de éstas, aunque no las incluidas en el presente pleito. Por ello solicitó al tribunal que, en caso que se dictara sentencia condenando a Ondeo a pagar alguna suma a Prieto Batista, se acompañase dicha orden con una orden a Acueductos para que reembolsara dicha suma a Ondeo.
El 5 de diciembre de 2005, Acueductos presentó “Contestación a Demanda Contra Coparte y Reconvención . En su contestación negó las alegaciones de la demanda contra coparte, según redactadas, aduciendo como su contestación lo dispuesto en el “Resolution Agreement” y el “Transition Services Agreement”. En la reconvención alegó que Ondeo había violado la See. 5.6 (e) del “Service Contract”, al no incluir un relevo de responsabilidad a favor de Acueductos en el contrato con Prieto Batista. Acueductos adujo que: “15. Por ello, la AAA no está obligada a realizar ningún pago por las gestiones realizadas por la *973 demandante Prieto Batista Legal Services, Inc. para el cobro de las cuentas morosas.”
El 15 de diciembre de 2005, se celebró la vista en su fondo, según señalada. Las partes manifestaron que habían acordado estipulaciones respecto los hechos pertinentes y, además, presentaron como evidencia quince (15) documentos, como Exhibits estipulados por las tres partes del litigio, y sometieron el caso a base de dichas estipulaciones. Los quince (15) Exhibits estipulados por las tres partes del litigio no incluian el “Service Contract”, ni los tres contratos relacionados a la terminación de la relación entre Ondeo y Acueductos, a saber: el “Resolution Agreement”, el “Transition Services Agreement”, ni el “Professional Services Agreement”. El tribunal ordenó a las partes presentar alegatos en treinta (30) días y les otorgó treinta (30) días adicionales para reaccionar a los alegatos de las otras partes, luego de lo cual el caso quedaría sometido para adjudicación por el tribunal.
Las estipulaciones presentadas fueron recogidas en la minuta de la vista de 15 de diciembre de 2005, como siguen:

“1 - La AAA recibió el total de los pagos de las cuentas morosas de los abonados que le fueron referidas a Prieto Batista Legal Services, para el cobro según contrato de servicios profesionales del 12 de septiembre de 2003, según estipulado como Exhibit 1.

2 — La AAA pagó honorarios al bufete luego de rescindido el contrato de servicios profesionales quedando sólo los honorarios reclamados en esta causa de acción.
3 - Que de estos pagos, la parte demandante reclama honorarios ascendentes a $100,292.13 lo que equivale al 12% a los honorarios contingentes que estipula el contrato.

4 - Las facturas del bufete Prieto Batista fueron dirigidas a Ondeo exclusivamente hasta el 13 de marzo de 2004, la próxima fue dirigida a Ondeo de Puerto Rico y/o Acueductos y Alcantarillados el 31 de marzo de 2004, todas las facturas posteriores fueron dirigidas a AAA. [A] partir de marzo de 2004, el bufete remitía los pagos de los abonados a la AAA. (Énfasis suplido.)

5 - Los tres casos, las tres sentencias son los trabajos realizados por el Bufete. [4]

6 - Se estipula que luego del 31 de marzo de 2005, [5] las facturas que pagó Ondeo esos dineros se reembolsaban.

7-La Autoridad de Acueductos y Alcantarillados fue quien decidió cancelar el contrato. ” [6]
El 12 de enero de 2006, el tribunal emitió resolución en la que dispuso que no se aceptaban las modificaciones a las alegaciones presentadas por Ondeo y Acueductos, según incluidas en la “Demanda Contra Coparte” de 17 de noviembre de 2005, por Ondeo, ni la “Contestación a Demanda Contra Coparte y Reconvención” de 5 de diciembre de 2005, por Acueductos. El 30 de enero de 2006, Ondeo solicitó reconsideración, la cual fue denegada. El tribunal, mediante resolución, se negó a resolver dentro de este pleito la controversia respecto a si Acueductos viene obligado a rembolsar a Ondeo cualquier suma que éste pague a Prieto Batista.
El 8 de mayo de 2006, el tribunal emitió sentencia, la cual declara “con lugar la demanda y en su consecuencia ordena a Ondeo y a AAA de forma solidaria al pago de la suma de CIEN MIL DOSCIENTOS NOVENTA Y DOS DOLARES CON TRECE CENTAVOS ($100,292.13) solicitados en la demanda, más el interés legal desde la radicación de la misma.” Ondeo solicitó la reconsideración, la cual fue denegada.
*974 Inconforme, Ondeo presento el recurso de apelación Núm. KLAN-2006-00861, señalando que incidió el tribunal:

1-... [AJI imponer responsabilidad solidaria a Ondeo y AAA a pesar de que el contrato fue transferido por Ondeo y solamente AAA se beneficiaba de las cobranzas gestionadas por la parte demandante-apelada.

2-... [A]l negarse a considerar la demanda contra co-parte de Ondeo.

3-... [A]l imponer intereses a partir de la radicación de la demanda a pesar de que las cobranzas que dan base a los honorarios de abogado no se habían completado a la fecha de la radicación de la demanda. ”

Por su parte, Acueductos presentó el recurso de apelación Núm. KLAN-2006-00862, señalando que erró el tribunal:

“1-... [AJI resolver que la AAA es responsable por el pago de honorarios ... a Prieto Batista.

2- ... [AJI declarar que la AAA es solidaria con Ondeo de Puerto Rico por el pago de los honorarios ... alegadamente debidos a Prieto Batista. ”

Consolidamos los dos recursos de apelación, ya que solicitan la revisión de la misma sentencia. Los demandantes-apelados, Prieto Batista, comparecieron mediante escrito de Oposición a Recurso de Apelación. Ambos apelantes-codemandados, Ondeo y Acueductos, sometieron alegatos en el recurso presentado por el otro co-demandado. Con el beneficio de dichas comparecencias, procedemos a resolver.
II
Consideraremos los primeros dos señalamientos de errores presentados por Ondeo y el primer señalamiento de error presentado por Acueductos conjuntamente, ya que todos estos impugnan la conclusión del tribunal de instancia de que Ondeo y Acueductos son solidariamente responsables a Prieto Batista por la suma de $100,292.13. Son los siguientes:
De Ondeo:

Primer error: Erró el Tribunal de Primera Instancia al imponer responsabilidad solidaria a Ondeo y AAA a pesar de que el contrato fue transferido por Ondeo y solamente AAA se beneficiaba de las cobranzas gestionadas por la parte demandante-apelada.

Segundo error: Erró el Tribunal de Primera Instancia al negarse a considerar la demanda contra co-parte de Ondeo. ”

De Acueductos:

Primer error. Erro el Tribunal de Primera Instancia al resolver que la AAA es responsable por el pago de honorarios de abogado a Prieto Batista. ”

La prueba creída por T.P.I. fue al efecto de que los $100,292.13 reclamados por Prieto Batista representan el 12% de los dineros recibidos por Acueductos relacionados a las cuentas morosas cuyo cobro fue obtenido mediante tres demandas gestionadas por Prieto Batista en virtud de su “Contrato de Servicios Profesionales”. Bajo éste, Prieto Batista se obligó a brindarle todo tipo de servicio legal que sea necesario o conveniente en la tramitación de los cobros de dinero que le sean referidos” por Ondeo (Cláusula “QUINTO” del contrato). Por su parte, Ondeo se obligó a pagarle a Prieto Batista “el equivalente al DOCE POR CIENTO (12%) de aquellas *975 cantidades que se cobren por la vía judicial.” (Cláusula “OCTAVO” del contrato) Bajo dicho contrato, Ondeo refirió a Prieto Batista las cuentas morosas de varios abonados de Acueductos. El bufete presentó demandas en cobro de lo adeudado y eventualmente obtuvo transacción o sentencia en los casos de cobros contra el Hospital San Lucas y el Hospital Dr. Susoni. El 12% del dinero recibido por Acueductos al amparo de dichas sentencias es $100,292.13 (Determinación de hecho Núm. 7 de la sentencia). En sus respectivas contestaciones a la demanda ambos, Ondeo y Acueductos, negaron ser responsables del pago de lo adeudado a Prieto Batista. Las aludidas demandas se dilucidaron en los casos JCD2003-1623, JCD2003-1622 y CCD2003-1052. Los primeros dos casos fueron presentados contra St. Loux Memorial Hospital en Ponce y el último de éstos fue contra Dr. Susoni Health Community Services. El contrato de servicios profesionales suscrito por Prieto Batista disponía que sus honorarios serían el 12% de lo actualmente recibido por Acueductos. En tanto no existe controversia que Prieto Batista presentó y gestionó las demandas y que Acueductos realmente recibió el dinero envuelto, no incidió el tribunal al concluir que Prieto Batista tiene derecho a recibir, como sus honorarios por servicios profesionales, la suma de $100,292.13.
Cuando Acueductos decidió terminar el “Service Contract” con Ondeo, dichas partes suscribieron varios acuerdos para proveer una transición ordenada y devolver el control de las operaciones a Acueductos. Entre éstos están el “Resolution Agreement” y el “Transition Services Agreement . Uno de los propósitos de dichos acuerdos era el traspasar o transmitir, de Ondeo a Acueductos, los derechos y las obligaciones, bajo los contratos que Ondeo había suscrito como parte de sus funciones, bajo el “Service Contract entre Ondeo y Acueductos. O sea, éstos eran contratos en los cuales Ondeo había comparecido, pero cuya razón de ser era procurar un beneficio para Acueductos, y Ondeo había suscrito los mismos como parte de sus funciones bajo el “Service Contract”. El “Contrato de Servicios Profesionales” entre Ondeo y Prieto Batista era uno de estos contratos.
Mediante una carta fechada 27 de enero de 2004, suscrita conjuntamente por el Director General de Ondeo, Philippe Maillard, y el Presidente Ejecutivo de Acueductos, Juan Agosto Alicea, éstos le informaron a los suplidores de productos y servicios que había comenzado un período de transición de Ondeo a Acueductos, que duraría hasta el 31 de marzo de 2004. Según dicha comunicación:

“[Djurante el período de transición, Ondeo de Puerto Rico será responsable por la contratación y adquisición de todos los bienes y servicios para la operación y mantenimiento del sistema, y tendrá la responsabilidad de efectuar los pagos de las facturas originadas en dicho período, pero la AAA proveerá a Ondeo los fondos respectivos a dichas facturas para pago a los suplidores. ...

... [Ujsted como suplidor podrá seguir proveyendo los materiales o servicios que hasta la fecha ha suplido bajo el contrato existente entre usted o su compañía y Ondeo de Puerto Rico hasta que se le notifique de lo contrario en cuyo caso recibirá una notificación formal separada. ”

El 30 de marzo de 2004, se le remitió una carta a Prieto Batista indicándole que se ejercían los derechos de rescisión del contrato, bajo la cláusula DECIMO CUARTO del mismo, por lo que se le instruia que “efectivo inmediatamente no presentíase] demandas nuevas o adicionales de los casos que tiene referidos . Las tres demandas de cobro a abonados morosos que nos conciernen fueron presentadas en el año 2003, según se desprende del número de los casos. Ondeo y Acueductos estipularon que La Autoridad de Acueductos y Alcantarillados fue quien decidió cancelar el contrato.”
En el período hasta marzo de 2004, “El contrato establecía que los pagos recibidos por Prieto Batista[, como resultado de las gestiones de Prieto Batista bajo el ‘Contrato de Servicios Profesionales ,] serían emitidos a favor y a la orden de la Autoridad de Acueductos y Alcantarillados y remitidos a *976 Ondeo.” (Determinación de hechos Núm. 4)
„ „„ lAJanÍr- [dd 31 de] marz0 de 2004’ Prieto Batista remitía los Pagos de los abonados a la AAA. (Determinación de Hechos Núm. 9).
Además de remitir los pagos directamente a Acueductos, en el período posterior a marzo de 2004, también hubo un cambio en la facturación por servicios profesionales del bufete. “Las facturas de Prieto Batista se dirigieron a Ondeo, exclusivamente, hasta el 13 de marzo de 2004, a la siguiente dirección Ondeo de Puerto Rico y/o a Acueductos y Alcantarillados. Desde el 31 de marzo de 2004, todas las facturas posteriores se dirigieron a AAA.” (Determinación de hechos Núm. 8). El 21 de mayo de 2004, Prieto Batista sometió a Acueductos la factura Núm. 13047, la cual indicaba un balance, por los servicios prestados que todavía no habían sido pagados, ascendente a $ 100,292.13.
Para poder determinar si incidió el tribunal de instancia, según señalado en las apelaciones, es necesario que resolvamos quien o quiénes son responsables de pagar los honorarios profesionales, ascendentes a $100 292 13 que previamente concluimos que Prieto Batista tiene derecho a recibir, por razón de los servicios prestados por dicho bufete. r 1
La intención de Ondeo y Acueductos, según se desprende de lo relatado y del resto del expediente del caso en apelación,, aparenta haber sido el sustituir a Ondeo por Acueductos en el “Contrato de Servicios Profesionales otorgado el 12 de septiembre de 2003 entre Ondeo y Prieto Batista, de tal forma que el contrato tuviese el mismo efecto como si Acueductos hubiese sido la parte que otorgó el mismo. Bajo el “Contrato de Servicios Profesionales”, el principal derecho que Ondeo tema era el recibir los pagos que hicieran los clientes morosos de Acueductos cuyas cuentas fueron referidas para cobro a Prieto Batista. Una vez Ondeo recibía los pagos, esta los contabilizaba y los remitía intactos a Acueductos, ya que los cheques estaban girados a nombre de Acueductos. La principal obligación de Ondeo era pagarle a Prieto Batista el 12% de las cantidades que se cobraran por vía judicial.
El sustituir a un nuevo acreedor por el acreedor original en una relación obligatoria, de tal forma que el nuevo acreedor reciba el servicio o la cosa objeto de la obligación, se denomina la cesión del derecho de crédito. Este proceso está regulado por el Capítulo 291 del Código Civil, denominado “Transmisión de Créditos y Demas Derechos Incorporales”, Arts. 1416 al 1426, 31 L.P.R.A. sees. 3941 a 3951. En el caso de autos no hubo problemas con la cesión del derecho de crédito que terna Ondeo, ya que una vez notificado del cambio, Prieto Batista procedió a enviar los pagos recibidos de los clientes morosos directamente a Acueductos.
La principal obligación o deuda que Ondeo tenía bajo el “Contrato de Servicios Profesionales” era el pagarle a Prieto Batista el 12% del dinero cobrado a los clientes morosos. La controversia del presente caso se refiere a si se logró sustituir a Acueductos como el deudor de los honorarios a que tiene derecho Prieto Batista, de forma tal que Ondeo quedase liberado de la deuda con Prieto Batista. Ondeo alega que mediante lo actuado se logró liberarlo de la deuda a Prieto Batista o, alternativamente, que aunque no se haya liberado, Ondeo tiene derecho a que Acueductos le rembolse cualquier pago que tenga que hacer a Prieto Batista! Acueductos sostiene que no tiene obligación de pagar nada a Prieto Batista, ni rembolsar a Ondeo por lo que este ultimo tenga que pagar a Prieto Batista.
El sustituir a un nuevo deudor por el deudor original en una relación obligatoria, de tal forma que el deudor original quede liberado de la deuda, requiere que se lleve a cabo una novación de la obligación. Este proceso esta regulado principalmente por el Subcapítulo VI - “Novación”, del Capítulo 247 del Código Civil - Extinción de las Obligaciones”, Arts. 1157 a 1167, 31 L.P.R.A. sees. 3241 a 3251. Los Arts 1157 a 1161 de este Subcapítulo, 31 L.P.R.A. sees. 3241 a 3245, disponen:

*977
“31 L.P.R.A. § 3241 Modificación de las obligaciones.

Las obligaciones pueden modificarse:

(1) Variando su objeto o sus condiciones principales.

(2) Sustituyendo la persona del deudor. (Énfasis suplido.)

(3) Subrogando a un tercero en los derechos del acreedor.

31 L.P.R.A. § 3242 Extinción de una obligación por otra.

Para que una obligación quede extinguida por otra que la sustituya, es preciso que así se declare terminantemente, o que la antigua y la nueva sean de todo punto incompatibles.

31 L.P.R.A. § 3243 Novación sin conocimiento del deudor primitivo; consentimiento del acreedor.

La novación, que consiste en sustituirse un nuevo deudor en lugar del primitivo, puede hacerse sin conocimiento de éste, pero no sin el consentimiento del acreedor. (Énfasis suplido.)

31 L.P.R.A. § 3244 Insolvencia del nuevo deudor

La insolvencia del nuevo deudor, que hubiese sido aceptado por el acreedor, no hará revivir la acción de éste contra el deudor primitivo, salvo que dicha insolvencia hubiese sido anterior y pública o conocida del deudor al delegar su deuda.

31 L.P.R.A. § 3245 Efecto de la novación sobre obligación accesoria.

Cuando la obligación principal se extinga por efecto de la novación, sólo podrán subsistir las obligaciones accesorias en cuanto aprovechen a terceros que no hubiesen prestado su consentimiento. ”

La doctrina interpretativa de los citados artículos, expresa que para que el deudor original quede liberado de su obligación, dicha intención tiene que expresarse en forma clara y patente. En Constructora Bauzá v. García López, 129 D.P.R. 579, 598-599 (1991), el Tribunal Supremo expuso:
“Conforme dispone el Artículo 1157 del Código Civil de Puerto Rico, 31, L.P.R.A. see. 3241, las obligaciones pueden modificarse: (1) variando su objeto o sus condiciones principales; (2) sustituyendo la persona del deudor; y (3) subrogando a un tercero en los derechos del acreedor. Por su parte, el Artículo 1158 del citado Código Civil, 31 L.P.R.A. see. 3242, establece que para ‘...que una obligación quede extinguida por otra que la sustituya es preciso que así se declare terminantemente, o que la antigua y la nueva sean de todo punto incompatibles’.” (Énfasis suplido.)
Un análisis de nuestra jurisprudencia, interpretativa de las antes mencionadas disposiciones legales, demuestra que hemos establecido, “...como pauta interpretativa de este articulado que la novación nunca se presume, sino que ha de ser acreditada sin género alguno de duda ... que la misma ... es siempre una cuestión de intención y que ésta debe inferirse de las circunstancias que rodean cada caso en particular ..."; que la "... doctrina puntualiza el elemento de la voluntad de las partes como determinante de la novación ... , y que por razón de que "... la extinción de la obligación conlleva la extinción de las garantías y demás derechos accesorios ...", resulta "... evidente que una consecuencia tan drástica como ésta sólo puede producirse cuando las partes han tenido clara conciencia de ella...". Warner Lambert v. Tribunal Superior, 101 D.P.R. *978 378, 389, 390 391 (1973). En relación con la incompatibilidad" a la que se refiere la segunda alternativa provista por el citado Artículo 1158 del Código Civil, hemos señalado que "... es a la absoluta, a la excluyente de todo punto ..."; cuestión que es una de "... interpretación que siempre suscita controversia ..." G.T., Inc. v. Doré Rice Mill, Inc., 108 D.P.R. 89, 91-92 (1978). (Énfasis suplido.)
En Marina Ind., Inc. v. Brown Bovery Corp., 114 D.P.R. 64, 73-74 (1983), rechazamos la posición a los efectos de que ...puede efectuarse una novación extintiva cuando las partes tan sólo se limitan a reproducir la misma obligación con algún cambio insignificante...". (Cursivas en original.) Por último, y en lo pertinente, en Teachers Annuity v. Soc. de Gananciales, 115 D.P.R. 277, 285-286 (1984), enfatizamos el hecho de que "...la doctrina, ha superado el rigor conceptualista que el Derecho romano impartió a la novación. Ayer la novación se concebía sólo como un medio de extinción de las obligaciones. Hoy, sin embargo, la admitimos con efectos más limitados, como es la simple modificación de la obligación...". (Cursivas en original.)
Previamente, en Teachers Annuity v. Soc. de Gananciales, 115 D.P.R. 277, 282-283 (1984), el Tribunal Supremo había expresado:

En efecto, la novación por cambio de la persona del deudor sólo puede darse con el consentimiento del acreedor. Así lo preceptúa el Art. 1159 del Código Civil: (Énfasis suplido.)

La novación, que consiste en substituirse un nuevo deudor en lugar del primitivo, puede hacerse sin conocimiento de éste, pero no sin el consentimiento del acreedor. ” 31 L.P.R.A. see. 3243. (Énfasis suplido.)
J. M. Manresa advierte que este consentimiento tiene que constar en forma patente y manifiesta. Comentarios al Código Civil Español, 6ta ed., Madrid, Ed. Reus, 1967, T. 8, Vol. I, pág. 895. No puede ser objeto de suposiciones ni de presunciones, puesto que su efecto jurídico es radical, extingue la deuda y desliga al deudor primitivo de toda obligación con el acreedor y crea un nuevo vínculo obligacional con el deudor sustituto. Más aún, la extinción de la deuda lleva consigo la extinción de las garantías y demás derechos accesorios, conforme las disposiciones del Art. 1161 del Código Civil, 31 L.P.R.A. see. 3245. En Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 391-392 (1973), acotamos que una consecuencia tan drástica como ésta sólo podía producirse cuando las partes tenían una clara conciencia de ello. (Énfasis suplido.)
En España, el Tribunal Supremo al interpretar el Art. 1205 del Codigo Civil español, equivalente a nuestro Art. 1159, ha resuelto reiteradamente que el consentimiento ha de constar de modo cierto y positivo y prestarse con el deliberado proposito de exonerar de sus obligaciones al deudor primitivo para hacerlos recaer en toda su extensión sobre el nuevo deudor. Sentencias del 22 de junio de 1911, 9 de abril de 1930, 27 de mayo de 1931 y 9 de febrero de 1945, entre otras. Véase, además, la discusión del tema en Castán Tobeñas, Derecho Civil español, común y foral, lOma ed., Madrid, Ed. Reus, 1967, T. 3, págs. 353-354; J. Puig Brutau, Fundamentos de Derecho Civil, 2da ed., Barcelona, Ed. Bosch, 1976, T. 1, Vol. 2, págs. 462-464; F. Puig Peña' Tratado de Derecho Civil Español, 2da ed., Madrid, Ed. Rev. Der. Privado, 1974, T. 3, Vol. II págs. 401-402; m' Albaladejo, Comentarios al Código Civil y compilaciones forales, Madrid, Ed. Rev. Der. Privado, 1980, T. 16, Vol. 1, pág. 576 et seq.; F. A. Sancho Rebullida, La Novación de las Obligaciones, Barcelona, Ed. Nauta, 1963, pág. 349. (Énfasis suplido.)
Es precisamente este deliberado propósito de exonerar al deudor primitivo lo que, a juicio de ese augusto tribunal, justifica que la insolvencia del nuevo deudor no haga revivir la acción del acreedor contra el primer deudor. Sentencia de 22 de junio de 1911. A este respecto, el Art. 1206 del Código Civil español preceptúa, al igual que nuestro Art. 1160, que:
*979 “La insolvencia del nuevo deudor, que hubiese sido aceptado por el acreedor, no hará revivir la acción de éste contra el deudor primitivo, salvo que dicha insolvencia hubiese sido anterior y pública o conocida del deudor al delegar su deuda. ”31 L.P.R.A. see. 3244.
Dicho artículo no hace más que subrayar el carácter extintor de la novación por cambio de la persona del deudor.
Los tres aludidos señalamientos de errores aquí discutidos no impugnan las dieciocho (18) determinaciones de hechos incluidas en la sentencia apelada, a las páginas 1 a 4 de la sentencia. Las determinaciones de hechos de la sentencia, los hechos estipulados previamente citados, y la evidencia documental incluida en los quince (15) Exhibits estipulados, no incluyen evidencia alguna de que Prieto Batista haya consentido, en forma clara y patente, a que se liberara a Ondeo de sus obligaciones por los honorarios profesionales y se sustituyera a Acueductos como el único deudor de los honorarios que restaban por pagarse, o sea, los $100, 292.13 de honorarios que dispone la sentencia. A igual tenor, los argumentos de Ondeo ante este Foro tampoco señalan que Prieto Batista haya declarado terminantemente su intención de liberar a Ondeo de su obligación de pagar los honorarios profesionales, aceptando como deudor a Acueductos. Por lo tanto, Ondeo sigue obligado bajo el “Contrato de Servicios Profesionales” a pagar a Prieto Batista los $100,292.13 que dispone la sentencia. Concluimos que no incidió el tribunal al declarar a Ondeo responsable por dicha deuda.
B
Pasamos ahora a considerar la posible responsabilidad de Acueductos respecto los $100,293.13 de honorarios profesionales que la sentencia dispone se le paguen a Prieto Batista. Según expondremos, Acueductos es responsable del pago (directamente al acreedor, Prieto Batista, o mediante reembolso a su apoderado, Ondeo,) debido a la responsabilidad del poderdante por las obligaciones incurridas por el apoderado, cuando dichas obligaciones se incurren dentro de los poderes y límites del contrato de mandato y el mandatario no ha incurrido en culpa o negligencia. Según veremos, aun si el mandatario ha excedido los límites de su poder o incurrido en culpa o negligencia, el mandante es responsable si lo ratifica expresamente, o aun cuando lo ratifica tácitamente, tal como cuando el mandante hace suyo los beneficios de lo actuado por el mandatario.
Ahora bien, según antes expusimos, el tribunal decidió que no iba a considerar dentro del presente litigio la demanda contra coparte presentada por Ondeo y las defensas contra ésta presentadas por Acueductos. Por ello, aún no se han admitido en evidencia los contratos entre Ondeo y Acueductos, tales como el “Service Contract”, “Resolution Agreement”, “Transition Services Agreement” y “Professional Services Agreement’ y otros. En caso de que el estudio y argumentación de los mismos llevase a la conclusión de que no es aplicable la figura del mandato a la relación entre Ondeo y Acueductos, o que existen algunas cláusulas particulares que permiten a Acueductos disfrutar los beneficios de las gestiones de Ondeo respecto las cuentas morosas, sin incurrir en responsabilidad hacia el tercero que prestó el servicio (Prieto Batista), ni hacia el apoderado (Ondeo), al tribunal todavía le quedaría por considerar la posibilidad que Acueductos fuese responsable bajo la doctrina de enriquecimiento injusto. En tanto no se puede descartar dicha posibilidad, no procede resolver en la presente etapa que Acueductos no es responsable por la deuda, ya que tal decisión constituiría cosa juzgada que impediría imponer responsabilidad a Acueductos bajo enriquecimiento injusto después del estudio de los antes mencionados contratos.
La naturaleza de las relaciones entre Ondeo, Acueductos y Prieto Batista, según surgen de las alegaciones no contradichas, los hechos y Exhibits estipulados por las tres partes, se encuentran expuestas en forma resumida en las determinaciones de hechos de la sentencia apelada. Estas no han sido impugnadas por las partes apelantes. Son particularmente pertinentes al considerar la responsabilidad de Acueductos por lo adeudado a Prieto Batista, las determinaciones de hechos núms. 2,4, 6, 8, 9, 10, 11, 12, 13, 14 y 16, las cuales son como sigue:
“2 - Para la fecha de la firma del contrato, Ondeo prestaba servicios de operador privado de la Autoridad *980 en virtud de contrato suscrito el 2 de mayo de 2002 titulado “Service Contract for Water and Wastewater System Asset Management , con el propósito de que Ondeo operara, manejara, mantuviera, reparara y cuando fuera necesario y apropiado reemplazara los activos de agua y aguas usadas de la AAA.

4 — El contrato establecía que los pagos recibidos por Prieto Batista de los abonados serían emitidos a favor y ala orden de la Autoridad de Acueductos y Alcantarillados y remitidos a Ondeo.

6 - La AAA recibió el total de los pagos de las cuentas morosas que le fueron referidas a Prieto Batista Legal Services para el cobro, según contrato de servicios profesionales. (Énfasis suplido.)

8 - Las facturas de Prieto Batista se dirigieron a Ondeo, exclusivamente, hasta el 13 de marzo de 2004, a la siguiente dirección Ondeo de Puerto Rico y/o a Acueductos y Alcantarillados. Desde el 31 de marzo de 2004, todas las facturas posteriores se dirigieron a AAA.

9 — A partir de marzo de 2004, Prieto Batista remitía los pagos de los abonados a la AAA.

10 - Alrededor del 13 de enero de 2004, la AAA decidió poner fin al Contrato con Ondeo, y suscribieron [los documentos denominados] Resolution Agreement, Transition Services Agreement y un Professional Services Agreement.

11 - El Resolution Agreement y el Transition Services Agreement establecían un período de transición durante el cual AAA se integraba a la operación del sistema, mientras Ondeo continuaba fungiendo en la operación.

12 — Durante el periodo de transición, Ondeo recibía un pago por servicios, mientras que AAA asumía todos los costos relacionados a la operación del sistema. Una vez concluido el período de transición, AAA quedó como operador exclusivo .y Ondeo pasó a ser un consultor. (Énfasis suplido.

13 - En el Transition Services Agreement se estableció que de conformidad con comunicación de 27 de enero de 2004 suscrita por Philippe Mallard, Director General de Ondeo y Juan Agosto Alicea, Presidente Ejecutivo de AAA [lo siguiente]. Los contratos otorgados por Ondeo de Puerto Rico que se encontraban vigentes al 31 de marzo de 2004, serian cedidos por Ondeo de Puerto Rico a la AAA, según se dispuso en el Contrato de Servicios original, para la eventualidad de una retoma por parte de AAA o cancelación del contrato. La AAA tenía derecho de asumir dichos contratos.

14 7 m °-riiculo décimo cuarto del Contrato de Servicios Profesionales entre Ondeo y Prieto Batista permitía la terminación del mismo por cualquiera de la partes con notificación previa de 60 días a saber:

“DECIMO CUARTO: Este acuerdo podrá ser rescindido mediante notificación escrita previa de 60 días de la parte que lo interesa rescindir a la otra parte, en cuyo caso “Ondeo" pagará a “La Firma" todas y cada una de las facturas certificadas que no se hayan pagado y en adición continuará pagando los honorarios correspondientes a todo pago que reciba de sus abonados que se efectúe como consecuencia del trabajo y servicio de La Firma", ya bien se haya obtenido por acuerdo extrajudicial o por sentencia”.

16 - El contrato de Servicios Profesionales entre Ondeo y Prieto Batista estaba vigente al 31 de marzo de 2004.” ■
Al considerar dichas determinaciones de hechos, en conjunto con las restantes determinaciones y el expediente en apelación, se desprende que Ondeo no compró los activos de la AAA ni tenía derecho a las ganancias o pérdidas de las operaciones, o sea, Ondeo no era dueño de Acueductos durante el período envuelto. *981 Su función era actuar y tomar decisiones por Acueductos en sus relaciones con suplidores, empleados, abonados y algunas otras terceras partes, respecto la operación de Acueductos, todo ello llevado a cabo para beneficio de Acueductos. Por sus funciones, Ondeo recobraba de Acueductos sus costos y, además, como su remuneración, Acueductos le pagaba un “management fee”.
De entre los contratos tipificados en el Código Civil, los más similares son los contratos de mandato, de prestación de servicios y de ejecución de obras.
Por ello, al considerar la relación entre Ondeo, Acueductos y Prieto Batista es necesario tener presente la normativa sobre el contrato de mandato, según dispuesta en el Código Civil. En particular son pertinentes al caso de autos los Arts. 1600, 1608, 1616, 1618 y 1619, 31 L.P.R.A. sees. 4421, 4429, 4448, 4461 y 4462, los cuales disponen:

“31 L.P.R.A. § 4421. Mandato, definición de. (Art. 1600)

Por el contrato de mandato se obliga una persona a prestar algún servicio o hacer alguna cosa, por cuenta o encargo de otra.

31 L.P.R.A. § 4429. Cuando el mandatario obra en su propio nombre. (Art. 1608)

Cuando el mandatario obra en su propio nombre, el mandante no tiene acción contra las personas con quienes el mandatario ha contratado, ni éstas tampoco contra el mandante.

En este caso, el mandatario es el obligado directamente a favor de la persona con quien ha contratado, como si el asunto fuera personal suyo. Exceptúase el caso en que se trate de cosas propias del mandante. (Enfasis suplido.)

Lo dispuesto en esta sección se entiende sin perjuicio de las acciones entre mandante y mandatario. (Énfasis suplido.)

31 L.P.R.A. § 4448. Responsabilidad personal del mandatario. (Art. 1616)

El mandatario que obre en concepto de tal no es responsable personalmente a la parte con quien contrata, sino cuando se obliga a ello expresamente o traspasa los límites del mandato sin darle conocimiento suficiente de sus poderes.

31 L.P.R.A. § 4461. Obligaciones contraídas por el mandatario. (Art. 1618)

El mandante debe cumplir todas las obligaciones que el mandatario haya contraído dentro de los límites del mandato. (Énfasis suplido.)

En lo que el mandatario se haya excedido, no queda obligado el mandante, sino cuando lo ratifica expresa o tácitamente. (Énfasis suplido.)

31 L.P.R.A. § 4462. Anticipos y reembolsos al mandatario. (Art. 1619)

El mandante debe anticipar al mandatario, si éste se lo pide, las cantidades necesarias para la ejecución del mandato.

Si el mandatario las hubiere anticipado, debe reembolsarlas el mandante, aunque el negocio no haya 
*982
salido bien, con tal que esté exento de culpa el mandatario. (Énfasis suplido.)”

El reembolso comprenderá los intereses de la cantidad anticipada, a contar desde el día en que se hizo la anticipación.
J. Puig Brutau, Fundamentos de Derecho Civil, t. II, vol. II, 2da ed., Bosch, Barcelona, 1982, capítulo VII, págs. 395 a 396, describe la naturaleza de estos tres contratos; y la forma de distinguirlos unos de los otros, como sigue:
MANDATO, PRESTACIÓN DE SERVICIOS Y EJECUCIÓN DE OBRA
1. Contratos dirigidos a la prestación de una actividad
Por el contrato d& mandato alguien actúa por cuenta de otro frente a terceros, con independencia de que lo haga en nombre propio o en el de su mandante, y de que lo haga de manera gratuita o a cambio de una remuneración. Por el contrato de prestación de servicios queda establecida entre dos personas una relación de dependencia, transitoria o duradera, que permite a una de ellas obtener servicios y a la otra cobrar una remuneración. Por el contrato de ejecución de obra, una de las partes queda obligada a proporcionar a la otra un resultado determinado, obtenido con su trabajo independiente, a cambio de un precio convenido.
Las tres figuras han de distinguirse claramente. Son actividades muy diferentes gestionar los intereses de otro frente a terceros (mandato), prestar servicios en situación de dependencia (prestación de servicios), o quedar obligado a emplear la propia iniciativa para obtener un resultado por encargo de la otra parte (contrato de obra).
En los casos de mandato aparece una relación triangular porque una persona gestiona intereses de otra mediante negociación con terceros. En el contrato de prestación de servicios sólo se tiene en cuenta la relación entre las partes que han de realizar las prestaciones convenidas, que consisten' en prestar servicios en relación de dependencia y pagar una remuneración. En el contrato de obra también se trata de intercambio de prestaciones entre los contratantes, pero con la particularidad que uno de ellos ha de pagar al otro el precio convenido por la obra que ha realizado como contratista independiente. (Énfasis suplido.)
Con semejante criterio, la discusión acerca de la diferencia entre el contrato de mandato y el de prestación de servicios ha de quedar superada. El mandatario gestiona los intereses de su principal frente a terceros; por el contrario, ni en el contrato de prestación de servicios ni en el de ejecución de obra existe el encargo de obrar con eficacia jurídica frente a terceros, sino la exclusiva pr[o]visión de unas prestaciones entre los contratantes. (Enfasis suplido.)
Es cierto que la redacción de los arts. 1.544 y 1.709 del Código civil [español, equivalentes a los Arts 1434 y 1600 del Código Civil de P.R., 31 L.P.R.A. sees. 4013 y 4421,] puede suscitar dudas. Dice el primero: “En el arrendamiento de obras y servicios, una de las partes se obliga a ejecutar una obra o a prestar a la otra un servicio por precio cierto.” Según el art. 1.709[, Art. 1600 de C.C. de P.R.,]: “Por el contrato de mandato se obliga una persona a prestar algún servicio o hacer alguna cosa, por cuenta o encargo de otra.” Sin embargo, las dudas que puedan derivar de tan imperfectas definiciones han de eliminarse a base de lo dicho, que puede resumirse diciendo que en los contratos de prestación de servicios y de ejecución de obras es el principal quien gestiona sus propios asuntos, aunque lo haga ayudado por los servicios o por el resultado de la actividad de otras personas, mientras que én el mandato la gestión corre a cargo del mandatario, hasta el punto que tendrá que rendir cuentas de lo que haya hecho en su relación con terceros.
__Estas conclusiones son acordes con la doctrina interpretativa del contrato de mandato, en particular los artículos 1616 y 1618, supra. J. Manresa, Comentarios al Código Civil Español, 6ta. Ed., t. 11, Reus, Madrid, *983 1972, comenta sobre los artículos 1.725 y 1.727 del Código Civil español, equivalentes a los Artículos 1616 y 1618 nuestros, supra, a las págs. 723-725, 735-736 y 738 de la referida obra. Con referencia al Art. 1616, el cual dispone que “El mandatario que obre en concepto de tal no es responsable personalmente a la parte con quien contrata sino cuando se obliga a ello expresamente o traspasa los límites del mandato sin darle conocimiento suficiente de sus poderes”, comenta:

“De ordinario, los apoderados no contraen obligación ninguna con aquellas personas con quienes contratan, si obran dentro de los límites de sus poderes. La cualidad de representación los exime de toda responsabilidad contractual, la cual es propia y exclusiva de sus representados: las acciones de los terceros no van contra ellos, van directamente a los poderdantes. Ese es el principal efecto de la representación: obligar al mandante, cual si personalmente hubiera contratado. Implícitamente, este es el primer supuesto del artículo 1.725[, Art. 1616 nuestro,] corroborado por la esencia propia del mandato (art. 1.709 [Art. 1600 nuestro]), y por lo que constituye el principal deber del mandante (artículo 1.725 [Art. 1616 nuestro]). Por esto, el legislador reserva el principio general de las obligaciones con relación a terceros, a las que son propias del representado. Mas puede ocurrir, y de hecho ocurre, que el mandatario resulte obligado a la parte que con él contrate. ¿Cuándo sucederá esto? Los supuestos legales son dos: (Enfasis suplido.)

a) Que el mandatario contrate a su nombre personal.

b) Que excediéndose de los límites de sus poderes, contrate como tal mandatario, sin dar conocimiento a la parte de los términos del mandato y de las facultades que en su virtud le están conferidas. [9] ...

a) En la primera hipótesis, el mandatario puede resultar obligado con el tercero cuando, teniendo éste mayor confianza en él que en su representado, crea la relación contractual a condición que la garantice, bien de modo subsidiario, bien directamente, obligándose de modo personal, sin perjuicio de su derecho a repetir (el mandatario) contra el mandante. ...”. (Énfasis suplido.)
Resultará también obligado el mandatario personalmente con el tercero cuando, sin traspasar los límites del mandato, no le dé conocimiento de su condición de apoderado. La razón es sencilla: la omisión voluntaria no puede perjudicar a la parte que ha entendido contratar con él, y, por tanto, las acciones que de ello se deriven a su favor las ejercitará, no contra el mandante, con quien contrató, sino contra el mandatario.
Observamos del anterior comentario que el mandatario usualmente no queda obligado, sino solamente el mandante. Ahora bien, en las situaciones en que el mandatario queda personalmente obligado, éste retiene el derecho a ser reembolsado por los gastos incurridos. Véase el Art. 1619, supra.
Además de lo que se desprende del Art. 1616, supra, el Art. 1618, supra, dispone que “el mandante debe cumplir todas las obligaciones que el mandatario haya contraído dentro de los límites del mandato. En lo que el mandatario se haya excedido, no queda obligado el mandante, sino cuando lo ratifica expresa o tácitamente. ” Manresa, supra, comenta respecto este último artículo:

“Constituyendo la esencia del mandato la representación ajena, es evidente que las obligaciones contraídas lo son por y para el mandante. Este es quien da lugar a la relación jurídica, y cuantos desenvolvimientos pueda ésta tener, a él sólo habrán de referirse. Para que así suceda, basta que el mandatario haya obrado dentro de las facultades conferidas por el poder, y que ostente en el acto jurídico su función representativa. Todavía más: las obligaciones derivadas de la relación creada por el mandatario y el tercero, excediéndose aquél de sus poderes, lo serán del mandante, si éste hace suyo el acto por ratificación tácita o expresa. (Enfasis suplido.)

*984
Sorprende cuando se estudia la jurisprudencia, lo mismo la nacional que la extranjera, las repetidas veces en que ha sido menester consagrar y reiterar la doctrina de que en el mandato quien estipula, quien promete y quien se obliga es el mandante por mediación del mandatario; y decimos que sorprende, porque los textos legales son claros en su espíritu, ya que no en su letra algunos. El hecho del mandatario, como dice Vadalá Papale, es el hecho del mandante. Y es que, filosóficamente considerado este artículo, no quiere decir más sino que la personalidad del mandatario, integra completamente la del mandante. Atendiendo, sin duda, a este concepto filosófico, es por lo que Laurent dicé que el mandatario no puede nunca considerarse c.omo un tercero en las escrituras que otorgue a nombre del mandante. (Énfasis suplido.)

Indeclinable consecuencia de la, representación es la responsabilidad del mandante, exigible ante los Tribunales de justicia, quienes han declarado siempre que el acto del mandatario dentro de los límites del poder, equivale a su ejecución por el propio mandante, siendo éste quien debe responder. Para valuar esta responsabilidad, Pothier cree suficiente la comprensión de los términos generales del acto realizado por el mandatario, aun en el caso de que, por razones desconocidas del tercero, hubiera un exceso en el ejercicio de las funciones conferidas. ” (Énfasis suplido.)
Al considerar la relación de Ondeo con Acueductos, nos es claro que la misma es fundamentalmente un contrato de mandato. Ondeo negocia con suplidores de servicios o materiales para obtener unos resultados de sean de beneficio a Acueductos. El caso del cobro de las cuentas morosas es un ejemplo típico de las funciones de Ondeo como mandatario. Ondeo tenía entre sus funciones el cobro por los servicios de la AAA de proveer agua (acueducto) y el recoger las aguas usadas (alcantarillado). Algunas de estas cuentas se convirtieron en cuentas morosas, por lo que Ondeo consiguió un bufete de abogados y acordó con éste, en el “Contrato de Servicios Profesionales , que se llevasen a cabo las gestiones de cobro mediante la presentación de demandas de cobro de las cuentas morosas.
Las demandas fueron presentadas a nombre de la AAA, la entidad legal dueña de las cuentas. Luego de obtener transacciones y/o sentencias, al recibir los pagos de los clientes, Prieto Batista se los entregaba a Ondeo. Ondeo los contabilizaba y se los entregaba a Acueductos, de forma que todo el dinero cobrado terminaba en las arcas de Acueductos. Una vez terminó el período de transición, o sea, posterior a 31 de marzo de 2004, Prieto Batista remitía los pagos directamente a Acueductos, por razón de que Ondeo había cesado en sus funciones como apoderado de Acueductos. Respecto los cobros bajo las tres demandas contra clientes morosos a que se refiere el presente litigio, en las cuales las sentencias fueron emitidas el 8 de marzo, 29 de marzo y 30 de abril del año 2004, Ondeo señala que los pagos fueron remitidos por Prieto Batista directamente a Acueductos. Véase que ambos, antes y después del 31 de marzo, los dineros cobrados terminaban en las arcas de Acueductos, por lo que Acueductos siempre fue el beneficiario de los servicios provistos por Prieto Batista. Ondeo, aunque contrató en su nombre con Prieto Batista, lo hizo para beneficio de Acueductos. Concluimos que la relación de Ondeo y Acueductos, para los propósitos del presente caso, era un mandato, con Acueductos como mandante y Ondeo como mandatario.
Al considerar la relación entre Ondeo, Acueductos y Prieto Batista, respecto el “Contrato de Servicios Profesionales , un aspecto inicial es si Ondeo suscribió el contrato simplemente a su nombre, sin manifestar que actuaba como apoderado de Acueductos, o si queda claro del contrato que Acueductos es el mandante y beneficiario de las gestiones que llevaría a cabo Prieto Batista y que Ondeo actúa como mandatario.
Al examinar el referido contrato, vemos que los párrafos PRIMERO y SEGUNDO hacen referencia a cuentas morosas de abonados de la Autoridad de Acueductos y Alcantarillados”. Ello implica que lo que se va a cobrar no es propiedad de Ondeo, sino que las cuentas a cobrar pertenecen a Acueductos, y que Ondeo actúa como apoderado de Acueductos. Pero la función de Ondeo como apoderado, y no como dueño de las cuentas a *985 cobrar, se desprende más claramente del párrafo NOVENO, pues éste expone que:
“NOVENO: “La Firma” se responsabilizará que todos los pagos que efectúen los abonados se emitan a favor y ala orden de Autoridad de Acueductos y Alcantarillados, cuyos pagos tan pronto se reciban por “La Firma” serán remitidos inmediatamente a “Ondeo”. (Énfasis suplido.)
De lo anterior, y del resto del expediente, queda claro que el cobro de las cuentas morosas, aunque contratado por Ondeo, era para beneficio de Acueductos, ya que éste era quien finalmente recibía los fondos cobrados, por lo que Ondeo actuaba como mandatario de Acueductos. Concluimos que el contrato era tal que hacía claro que Ondeo actuaba como apoderado de Acueductos. Bajo tales circunstancias, aplica directamente lo provisto en el Art. 1618, supra, el cual dispone que “El mandante debe cumplir todas las obligaciones que el mandatario haya contraído dentro de los límites del mandato. ”
Además, el hecho que Acueductos aceptó recibir y hacía suyo los dineros cobrados, ya que estos dineros siempre terminaron en las arcas de Acueductos, activa lo provisto en el segundo párrafo del Art. 1618, supra. Por ello, aun si en alguna forma Ondeo se hubiese excedido en los poderes que le confirió el mandante (Acueductos), este último queda directamente obligado ante el tercero, Prieto Batista. En resumen, ya sea mediante el primero o el segundo párrafo del Art. 1618, supra, Acueductos es directamente responsable por las obligaciones contraídas por Ondeo en el “Contrato de Servicios Profesionales".
En resumen, en caso de que por alguna evidencia o razonamiento a ser presentado posteriormente por Acueductos se concluyera que los términos del “Contrato de Servicios Profesionales” no atan directamente a Acueductos bajo el Art. 1618, supra, ello no libera de responsabilidad a Acueductos. Bajo estas circunstancias, el pago que Ondeo haga a Prieto Batista constituiría un costo reembolsable bajo el Art. 1619, supra, ya que dicho artículo provee que “Si el mandatario hubiere anticipado[ las cantidades necesarias para la ejecución del mandato], debe reembolsarlas el mandante, aunque el negocio no haya salido bien, con tal que esté exento de culpa el mandatario.” (Énfasis suplido.) O sea, que en tales circunstancias, aunque Acueductos no tendría que pagar directamente a Prieto Batista los $100,292.13, Acueductos tendría que rembolsar a Ondeo lo pagado por esta última a Prieto Batista. Bajo cualquiera de las dos alternativas, Acueductos tiene que desembolsar la cantidad que se le debe a Prieto Batista bajo la sentencia. No incidió el tribunal de instancia al resolver que Acueductos era responsable del pago.
Reflexionando sobre lo citado y aplicándolo a la situación de autos, es evidente que Acueductos es directamente responsable a Prieto Batista por la deuda.
Como un fundamento alternativo a lo antes expuesto, observamos que analizados los hechos desde la perspectiva de enriquecimiento injusto, el resultado es similar, ya que también procedería encontrar a Acueductos responsable de la deuda a Prieto Batista. En E.L.A. v. Cole Vázquez, 2005 J.T.S. 55, el Tribunal Supremos expuso que:

“De enriquecimiento injusto se habla propiamente cuando la ley no ha previsto una situación en la que se produce un desplazamiento patrimonial que no encuentra una explicación razonable en el ordenamiento vigente.

Para que proceda la aplicación de dicha doctrina es necesario que concurran ciertos requisitos básicos, a saber: i) existencia de un enriquecimiento; ii) un correlativo empobrecimiento; iii) una conexión entre dicho empobrecimiento v enriquecimiento; iv) falta de una causa que justifique el enriquecimiento; v) inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa.” Ortiz Andujar, ante; Morales v. Municipio de Toa Baja, 119 D.P.R. 682 (1987).
*986 Las acciones, acuerdos o controversias surgidas entre Ondeo y Acueductos no pueden privar a Prieto Batista de los honorarios acordados por el trabajo que realizó. Ello conllevaría una reducción o desplazamiento de patrimonio de Prieto Batista a las partes demandadas. Si Prieto Batista hubiese dedicado sus recursos de tiempo y esfuerzo profesional a otras demandas, en vez de las demandas que llevó a nombre de la Autoridad, hubiese recibido remuneración por ello. Acueductos se enriqueció como consecuencia de los esfuerzos del Bufete Prieto Batista, al recibir los pagos de las cuentas morosas. Este desplazamiento patrimonial, que consiste en una pérdida para Prieto Batista y un enriquecimiento para Acueductos, no tiene justificación jurídica en la situación fáctica del caso. No hay indicios, ni siquiera alegación, de que Prieto Batista aceptó trabajar de gratis. Tampoco hay indicios que Ondeo tenía la intención de absorber, sin reembolso por Acueductos, los costos envueltos en la litigación. [12] Por lo tanto, bajo la normativa de enriquecimiento injusto, también procedería declarar a Acueductos responsable por los honorarios profesionales que se le deben a Prieto Batista.
No se cometió el primer de error señalado en la apelación presentada por Ondeo, ni los dos errores señalados en la apelación presentada por Acueductos.
III
Consideramos el señalamiento de error planteado por Ondeo que concierne a la decisión del tribunal de no permitir la presentación por Ondeo de la demanda contra coparte y las correspondientes alegaciones de Acueductos en la contestación a la demanda contra coparte y reconvención.
En el presente caso, la demanda se presentó el 22 de octubre de 2004. Ondeo contestó la demanda el 20 de enero de 2005 y Acueductos la contestó el 13 de mayo de 2005. Luego del descubrimiento de prueba, las partes presentaron el Informe de Conferencia entre Abogados el 19 de agosto de 2005, quedando la vista en su fondo señalada para el 15 de diciembre de 2005. Ésta se celebró en la fecha pautada.
Ahora bien, el 17 de noviembre de 2005, faltando sólo veintiocho (28) días para la vista en su fondo, Ondeo presentó el escrito denominado Demanda Contra Coparte. El 5 de diciembre de 2005', diez (10) días previo a la vista en su fondo, Acueductos presentó su escrito de Contestación a Demanda Contra Coparte y Reconvención. El tribunal no aceptó la presentación de la demanda contra coparte ni la contestación y reconvención por Acueductos, emitiendo resolución al respecto el 12 de enero de 2006, como sigue:

“ORDEN

El 20 de enero de 2005 contestó la demanda.

El 15 de diciembre de 2005, se celebró la vista en su fondo y el caso quedó sometido por acuerdo entre las partes. Los hechos alegados en la demanda y los estipulados por las partes no son nuevos y se conocen al menos desde la fecha de su contestación a la demanda. El caso concluyó, sólo está pendiente la sentencia. Si tiene alguna reclamación nueva, debe presentarla en un caso aparte. Aquí tuvo las oportunidades y no lo hizo. Los casos no tienen vida eterna.

NOTIFÍQUESE. ”

Las Reglas 13.1 y 37.1 de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 13.1 y 37.1, disponen como sigue:

“32a L.P.R.A. § Regla 13.1 Enmiendas.

Cualquier parte podrá enmendar sus alegaciones una vez en cualquier momento antes de habérsele notificado una alegación respondiente, o si su alegación es de las que no admiten alegación respondiente y el pleito no ha sido señalado para juicio, podrá de igual modo enmendarla en cualquier fecha dentro de los veinte 
*987
(20) días de haber notificado su alegación. En cualquier otro caso, las partes podrán enmendar su alegación únicamente con permiso del tribunal o mediante el consentimiento por escrito de la parte contraria; y el permiso se concederá liberalmente cuando la justicia así lo requiera. Una parte notificará su contestación a una alegación enmendada dentro del tiempo que le restare para contestar la alegación original o dentro de veinte (20) días de notificársele la alegación enmendada, cualquiera de estos plazos que fuere más largo, a menos que el tribunal de otro modo lo ordenare. (Enfasis suplido.)

32a L.P.R.A. § Regla 37.1 Conferencia

En cualquier pleito, el tribunal podrá, en el ejercicio de su discreción, ordenar a los abogados de las partes que comparezcan a una conferencia para considerar: (a) la simplificación de las cuestiones litigiosas; (b) la necesidad o conveniencia de enmendar las alegaciones; ... (f) cualesquiera otras medidas que puedan facilitar la más pronta determinación del pleito. (Enfasis suplido.)

El tribunal dictará una orden en que expondrá lo acordado en la conferencia, las enmiendas que se hubieren permitido a las alegaciones y las estipulaciones de las partes en relación con cualesquiera de los asuntos considerados y que limiten las cuestiones litigiosas a ser consideradas en el juicio, a aquellas no resueltas mediante admisiones o estipulaciones de los abogados; y dicha orden, una vez dictada, gobernará el curso subsiguiente del pleito, a menos que sea modificada en el juicio para impedir manifiesta injusticia. ” (Énfasis suplido.)
En Romero v. S.L.G. Reyes Carraquillo, 2005 J.T.S. 66, el Tribunal Supremo elaboró sobre la interpretación de las Reglas citadas como sigue:
“[La Regla 37.1, supra,] es consecuencia necesaria del principio básico de nuestro sistema procesal de garantizar una solución justa, rápida y económica. Su propósito es simplificar, reducir y hasta evitar el juicio si es posible. J. Cuevas Segarra, Tratado de Derecho Procesal Civil, Tomo II, Publicaciones J.T.S., [pág.j 620 (2000). Hemos señalado que la conferencia con antelación al juicio le ofrece a las partes la oportunidad para someter al tribunal posibles enmiendas a las alegaciones antes de la vista en su fondo. Ortiz Díaz v. R. & R. Motors Sales Corp., 131 D.P.R. 829, 837 (1992). Además, las enmiendas pueden ampliar una de las causas de acción alegadas en la demanda original, añadir una o más causas de acción o plantear nuevas teorías. Cruz Cora v. UCB/Trans. Union P.R. Div., 137 D.P.R. 917, 923 (1995). Un cambio de teoría por sí sólo no es suficiente para denegar el permiso a menos que cause perjuicio al demandado. ” Cuevas Segarra, supra, en la pág. 317.
Por otro lado, la Regla 13.1 de Procedimiento Civil permite a las partes enmendar sus alegaciones “una vez en cualquier momento antes de habérsele notificado una alegación respondiente’’. 32 L.P.R.A. Ap. Ill, R. 13.1 (2002). Posterior a ello sólo se podrá hacer “con permiso del tribunal o mediante el consentimiento por escrito de la parte contraria; y el permiso se concederá liberalmente cuando la justicia así lo requiera”. Id. (Énfasis en opinión.).
De ambas reglas se desprende que la decisión de permitir enmendar las alegaciones es discrecional del tribunal. Sin embargo, hemos establecido varios criterios para demarcar el ejercicio adecuado de dicha discreción. Estos son: (a) el momento en que se solicita la enmienda; (b) el impacto de la solicitud en la pronta adjudicación de la cuestión litigiosa; (c) la razón o ausencia de ella para la demora e inacción original del promovente de la enmienda; (d) el perjuicio que la misma causaría a la otra parte; y (e) la naturaleza y méritos intrínsecos de la defensa que se plantea. Epifanio Vidal, Inc. v. Suro, 103 D.P.R. 793, 796 (1976). Por eso, si bien se ha estatuido la liberalidad como parámetro general para la concesión del permiso, dicha liberalidad no es infinita, sino que está condicionada por un juicioso ejercicio de discreción, que ha de ponderarse según los criterios antes mencionados. El principal de éstos es el perjuicio que se le pueda *988 causar a la otra parte al conceder la enmienda: “[n]o es permisible [sicj enmiendas a la demanda cuando se introducen nuevas y separadas causas de acción o cuando hay incuria, mala fe o propósitos dilatorios, causando perjuicio”. Cuevas Segarra, supra, en lapág. 321 (Negritas en original, subrayado añadido.).
Al aplicar las normas citadas a la situación de autos, observamos que existe un número sustancial de factores que militan contra de que se permitan las modificaciones a las alegaciones, según presentadas en la demanda contra'coparte, contestación á demanda contra coparte y reconvención. En primer lugar, las enmiendas propuestas por Ondeo fueron presentadas el 17 de noviembre de 2005 y la contestación de Acueductos, incluyendo una reconvención, fue presentadas el 5 de diciembre de 2005. Dichas nuevas alegaciones fueron presentadas tan sólo veintiocho (28) días y diez (10) días, respectivamente, previos a la vista en su fondo. Además, fueron presentadas más de tres meses luego de haber sido aprobado el Informe de Conferencia entre Abogados y señalado el juicio en su fondo. La presentación de dichas alegaciones fue muy tardía. De haber sido acogidas las mismas, hubiese sido necesario dejar sin efecto el señalamiento de la vista en su fondo del caso, reabrir el descubrimiento de prueba, presentar un nuevo informe de conferencia entre abogados y reseñalar el juicio en su fondo.
En segundo lugar, al examinar los escritos de 17 de noviembre y 5 de diciembre, presentados por Ondeo y Acueductos respectivamente, encontramos que los hechos en los cuales dependen dichas alegaciones eran conocidos desde que estas partes presentaron las contestaciones a la demanda. O sea, las nuevas alegaciones no son el resultado de información reciente producto del descubrimiento de prueba, sino que podían haberse presentado al mismo tiempo que se presentaron las contestaciones a la demanda.
En adición, las controversias planteadas en la demanda contra coparte convierten el caso en uno sustancialmente más complejo, lo cual demoraría su adjudicación e incrementaría los costos de litigación para la parte demandante, causándole sustancial perjuicio a esta última. Las nuevas alegaciones requieren un estudio cuidadoso de los contratos entre Ondeo y Acueductos, tales como el “Service Contract”, original y sus modificaciones, mediante los documentos denominados “Resolution Agreement”, “Transition Services Agreement” y “Professional Services Agreement’. Estos documentos son extensos, complicados y reflejan un negocio jurídico muy amplio. Estos conciernen los arreglos para traspasar de Acueductos a Ondeo (y luego de Ondeo a Acueductos), el control operacional de una entidad con muchos miles de empleados, cerca de un millón de abonados y una planta física que cubre todo Puerto Rico. El tener que interpretar los referidos contratos para dilucidar si la responsabilidad es solamente de Acueductos, o solamente de Ondeo, ampliaría sustancialmente las controversias a dilucidarse en el pleito, conllevando significativas demoras y aumentos en los costos de litigación a la parte demandante, en claro perjuicio de sus intereses.
Al considerar los aspectos que militan contra de que se permitieran las enmiendas a las alegaciones, resolvemos que no abusó de su discreción el tribunal de instancia al no permitir dichas enmiendas dentro del presente pleito. Las controversias presentadas por Ondeo y Acueductos en las demanda contra coparte, contestación y reconvención, pueden dilucidarse en un pleito subsiguiente, del cual Prieto Batista no sea parte, en caso que Acueductos y Ondeo no logren transigir extrajudicialmente dichos asuntos. No se cometió el segundo error señalado en el recurso KLAN-2006-00861.
IV
Resta expresarnos sobre el tercer señalamiento de error de la apelación presentada por Ondeo, en el recurso KLAN-2006-00861. En éste, Ondeo reclama que no procede computar intereses sobre los honorarios profesionales adeudados desde la fecha de la presentación de la demanda, porque algunos de los pagos se recibieron en fecha posterior a la presentación de la demanda.
En primer lugar, lo alegado por Ondeo omite parte de los hechos, ya que también se recibieron pagos antes de la presentación de la demanda, los cuales acumulaban intereses por mora que no fueron reflejados en la sentencia. La mera existencia de algunos pagos posterior a la presentación de la demanda no es lo único a considerarse, pues *989 si se fuera a basar el interés en la fecha en que se recibieron los pagos de los clientes, habría que considerar igualmente los pagos recibidos en períodos previos a la presentación de la demanda. Pero más importante es que la evidencia aducida por Ondeo respecto la fecha en que se recibieron los pagos no es parte de la evidencia admitida por estipulación en la vista de 15 de diciembre de 2005. Esta evidencia no puede ser traída para impugnar la sentencia. Regla 74 del Reglamento del Tribunal de Apelaciones, 4 L.P.R.A. Ap. XXII-B. Méndez v. Fundación, 165 D.P.R. _, 2005 J.T.S. 106 de 11 de julio de 2005. No se cometió el error señalado.
V
Por las consideraciones antes expuestas, se confirma la sentencia del Tribunal de Primera Instancia en el caso KAC-2004-7289.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2007 DTA 42
1. El bufete Prieto Batista suscribió el contrato con Ondeo bajo el nombre comercial “Prieto Batista Legal Services, Inc.” Originalmente, la demanda se presentó bajo dicho nombre comercial, pero previo al Informe de Conferencia Entre Abogados la parte demandante presentó una demanda enmendada en la cual incluyó como codemandantes al Ledo. Mario A. Prieto Batista y al Ledo. Manuel Herrero García. Las restantes alegaciones de la demanda no fueron modificadas en ningún aspecto sustancial. El tribunal aceptó el cambio.
2. Utilizamos el adjetivo “morosos”, ya que así se les describe en el Contrato de Servicios Profesionales entre Ondeo y Prieto Batista.
3. Aunque la carta fue impresa en papel timbrado de Ondeo, las partes demandadas estipularon que Acueductos fue quien decidió cancelar el contrato.
4. El reclamo presentado por Prieto Batista refleja los honorarios de doce por ciento (12%) sobre lo cobrado bajo las tres sentencias obtenidas en los casos JCD2003-1623, JCD2003-1622 y CCD2003-1052. La parte demandante en estos casos era la Autoridad de Acueductos y Alcantarillados.
5. La referencia al año aparenta ser un error, siendo el año correcto el 2004, pero ello no tiene consecuencias sobre los resuelto por el tribunal o los señalamientos de errores.
6. Esta última estipulación fue acordada solamente por Ondeo y Acueductos. Similarmente, Ondeo y Acueductos, sin que concurriera Prieto Batista, estipularon como Exhibits el “Service Contract" y el “Resolution Agreement”, pero no estipularon ni presentaron ante el tribunal el “Transition Services Agreement” ni el “Professional Services Agreement'.
7. Aunque el párrafo DECIMO CUARTO indica que la rescisión es efectiva sesenta (60) días después de la notificación, la carta indicaba el 30 de abril de 2004 como la fecha de efectividad de la rescisión, sin explicar la razón para la inconsistencia. Aunque la carta no hace mención respecto gestiones bajo las demandas ya comenzadas, las sentencias en las tres demandas fueron emitidas el 8 de marzo de 2004, 29 de marzo de 2004 y 30 de abril de 2004, períodos en los cuales estaba en pleno vigor el “Contrato de Servicios Profesionales”.
8. Los quince (15) Exhibits que las tres partes, Ondeo, Acueductos y Prieto Batista, estuvieron dispuestos a estipular en la vista en su fundo de 15 de diciembre de 2005, no incluyen los cuatro (4) contratos principales entre Ondeo y Acueductos.
9. Véase Manresa, supra, págs. 725-727, para una exposición sobre esta situación.
10. Esta conclusión está limitada a situaciones como las presente, en las cuales Ondeo gestiona con terceras partes, los suplidores de servicios o bienes, la provisión de dichos servicios o bienes para beneficio de Acueductos. O sea, la conclusión *990 a que llegamos no excluye la posibilidad de que parte de las funciones de Ondeo constituyesen un contrato de prestación de servicios. Ejemplo de esto podría ocurrir cuando un empleado de Ondeo prepara un manual técnico sobre las normas y procedimientos para la operación de una planta propiedad de Acueductos, o provee entrenamiento sobre dichos procedimientos a los empleados de Acueductos.
11. Véase la Pág. 11 de la apelación de Ondeo, caso KLAN-06-00861, y las páginas del apéndice a que dicha parte hace referencia Ademas, en las primera de las estipulaciones de hechos, Acueductos acepto haber recibido todos los pagos relacionados a los honorarios de $100,292.13 otorgados en la sentencia.
12. La alegación en el recurso KLAN-2006-00862, presentada por Acueductos, que el “Contrato de Servicios Profesionales” &S U™,a betjeficw de tercero, que beneficia a la AAA (el tercero) sin que ésta tenga que dar ninguna prestación a cambio (énfasis suplido), es meramente una teoría legal, una interpretación y conclusión acomodaticia de Acueductos respecto la cual no presento evidencia alguna. Dicha teoría es contraria al comportamiento usual de empresas con motivos de lucro, tales como Ondeo, por lo cual es poco creíble de su faz.